# In the United States Court of Federal Claims

No. 22-1038C

(Filed Under Seal:  December 15, 2022)

(Reissued for Publication:  December 21, 2022)

|  |  |
|---|---|
| **EKAGRA PARTNERS, LLC,** | ) |
| *Plaintiff,* | ) |
| **v.** | ) |
| **THE UNITED STATES,** | ) |
| *Defendant,* | ) |
| **and** | ) |
| **PARADYME MANAGEMENT, INC.,** | ) |
| *Defendant-Intervenor.* | ) |

*Jon D. Levin*, Maynard, Cooper & Gale, P.C., Huntsville, AL, for Plaintiff.  With him on the briefs were *W. Brad English, Emily J. Chancey, Joshua B. Duvall*, and *Nicholas P. Greer*.

*Joshua W. Moore*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Lisa L. Donahue*, Assistant Director.  Of counsel was *Wilmary Bernal*, Office of the General Counsel, United States Department of Commerce, Washington, D.C.

*Christian B. Nagel*, Holland & Knight, LLP, Washington, D.C., for Defendant-Intervenor. Of counsel were *Gregory R. Hallmark, Amy L. Fuentes, Kelsey M. Hayes*, and *Sean Belanger*.

<u>**OPINION AND ORDER**</u>*

*SOLOMSON*, Judge.

This Court does not examine procurement decisions with an electron scanning microscope, searching for the slightest of imperfections. As Judge Tapp recently noted, "even 'violations of law,' let alone innocuous mistakes, should not result in setting aside awards unless those mistakes have some significance, for '[a]ny good lawyer can pick lint off any Government procurement.'"[1] In this case, Plaintiff, Ekagra Parnters, LLC ("Ekagra"), has the burden to allege and then prove that Defendant, the United States — acting by and through the United States Census Bureau ("Census" or "USCB") — not only committed some error in awarding the contract at issue to the Defendant-Intervenor, Paradyme Management, Inc. ("Paradyme"), but also that any such error prejudiced Ekagra. Ekagra, however, alleges procurement errors that are more akin to dust particles than troublesome lint.

After considering Ekagra's arguments and the administrative record, the Court discerns no prejudicial error in USCB's conduct of the procurement at issue. Because Ekagra fails to carry its burden, the Court concludes that the government and Paradyme are entitled to judgment.

## I.   FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. The Procurement

On July 1, 2021, Census issued Solicitation No. 1333LB21Q00000010 (the "Solicitation" or "RFQ"), pursuant to which Census planned "to award a Single Award

---

* Pursuant to the protective order in this case, the Court initially filed this opinion under seal on December 15, 2022, and directed the parties to propose redactions of confidential or proprietary information by December 20, 2022. ECF No. 38. The parties have jointly submitted proposed redactions to the Court. ECF No. 40. The Court adopts those redactions, as reflected in this public version of the opinion. Words or phrases that are redacted have been replaced with [ * * * ].

[1] *Ginn Grp., Inc. v. United States*, 159 Fed. Cl. 593, 608 (2022) (alteration in original) (quoting *Andersen Consulting v. United States*, 959 F.2d 929, 932 (Fed. Cir. 1992)); *see also Caddell Constr. Co. v. United States*, 129 Fed. Cl. 383, 403–04 (2016). This Court similarly observed in a recent decision that a plaintiff's "questions" regarding the conduct of a procurement "do not substitute for the evidence necessary to succeed on the merits." *Ahtna Logistics, LLC v. United States*, -- Fed. Cl. --, 2022 WL 17480642, at *1 (Fed. Cl. Nov. 28, 2022) (describing "prejudice on the merits" as "an issue, in this Court's experience, to which plaintiffs all-too-often do not pay sufficient attention, usually at their own peril").

[2] This background section constitutes the Court's findings of fact drawn from the administrative record. Rule 52.1 of the Rules of the United States Court of Federal Claims, covering judgment on the administrative records, "is properly understood as intending to provide for an expedited

Blanket Purchase Agreement (BPA), as a vehicle to obtain Tools services for the Applications Development and Services Division (ADSD) in its support of several [Census] directorates and divisions."   AR 440; AR 1015 (RFQ § B.1).   The contract awardee will provide "all on-site and off-site support management, supervision of contractor's personnel, and labor to plan, coordinate, and ensure effective performance, for all requirements outlined in Section C of [the RFQ]."   AR 1015 (RFQ § B.1).   In particular, the selected contractor "will provide the standards and solutions necessary to address . . . challenges and transform the way [Census] accomplishes [information technology] tools management" by supporting the establishment of a Tools Support Center of Excellence ("TSCoE").   AR 1021 (RFQ § C.2).   The TSCoE will reorganize support functions, moving activities "from the development and functional organizations throughout Census, to a centralized model of those same functions, as a resulting Shared Service."   AR 1021; *see also* AR 1019–20 (describing and depicting the change).   Paradyme is the incumbent contractor for the services sought in the RFQ. AR 12.   Census issued four amendments to the RFQ between July 9 and July 16, 2021. AR 752, 1140.   The government issued its final, conformed RFQ on July 15, 2021. AR 1013–15 (RFQ Amend. 003).   Quotes were due July 20, 2021, by 12:00 pm.   AR 1141 (RFQ Amend. 004).

The RFQ specified that Census would "issue a Single Award BPA pursuant to the authority of Federal Acquisition Regulation (FAR) 8.405-3 — Blanket Purchase Agreements (BPAs), under General Services Administration (GSA) Multiple Award Schedule (MAS) Information Technology (IT) contract."   AR 1015 (RFQ § B.2).[3]   The resulting BPA "will include an ordering period of 5 years (consisting of one 12-month Base Period, four 12-month Option periods)," and provide a vehicle for Census "to fulfill necessary requirements in the form of issued Call Orders."   AR 1015.   Such call orders "may be issued on a Firm-Fixed-Price (FFP) [basis], Labor Hour (LH) [basis,] or any combination thereof as required to meet agency needs," with the precise contract type to be determined at the call order level.   AR 1015.   The RFQ included specifications for two call orders to be awarded along with the BPA:  (1) Call Order 0001 is for "the planning, development, and implementation activities necessary to create the TSCoE," AR 676 (RFQ Attach. J.12); (2) Call Order 0002 is for "Tools Application/Administration support services," AR 711–12 (RFQ Attach. J.13).

---

trial on the record" and requires the Court to "make factual findings from the record evidence as if it were conducting a trial on the record."   *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354, 1356 (Fed. Cir. 2005).   Citations to the corrected administrative record, *see* ECF No. 24, are denoted as "AR" followed by the page number.   Additional findings of fact are made throughout Part IV.

[3] The procurement "is a 100% Total Small Business Set-Aside for Small Business (SB) MAS IT contract holders" such that "only quotes submitted by GSA MAS IT SB" are eligible for award. AR 1015 (RFQ § B.2.1).

Section L of the RFQ contains instructions to quoters.  AR 1108.  The RFQ required quoters to submit written quotes that "conform to solicitation provisions[,] . . . prepared in accordance with this section."  AR 1110 (RFQ § L.3).  Quotes had to be "written[] [and] prepared in sufficient detail for effective evaluation of the . . . quote against the evaluation criteria," to include "documentation [that] cover[s] all aspects of this solicitation."  AR 1110.  The RFQ required quoters to "demonstrate how [they] intend[] to accomplish the project and must include convincing rationale and substantiation of all claims."  AR 1110.  Census cautioned quoters that, as part of "its evaluation, the Government will consider the degree of substantiation of the quoted approaches in the quote volumes and in response to any technical exchanges if held."  AR 1110.

The RFQ required the submission of two proposal volumes, which were also assigned correlative evaluation factors, as follows:

| Volume | Evaluation Factor | Evaluation Subfactors |
|---|---|---|
| I   Technical | 1   Similar Experience and Past Performance | 1A   Similar Experience<br>1B   Past Performance |
| | 2   Master BPA — Technical | 2A   Management Approach for BPA<br>2B   Key Personnel for BPA |
| | 3   Call Order 0001 — Technical Approach | N/A |
| | 4   Call Order 0002 — Technical Approach | N/A |
| II   Price | 5   Price | 5A   Labor Rate Pricing for Master BPA<br>5B   Pricing for Call Order 0001<br>5C   Pricing for Call Order 0002 |

AR 1113 (RFQ § L.5.1); AR 1124 (RFQ § M.1.1) (identifying "evaluation factors").

For evaluation subfactor 1A (Similar Experience), quoters had to "submit a synopsis of their similar experience for [Census] review as defined in the Similar Experience Citation Template."  AR 1114 (RFQ § L.6.2.1).  The point of such similar experience citations was to "provide evidence of the Quoter's experience on three (3) contracts that have been performed, or are currently being performed either federally or commercially, not older than three years from the RFQ release date, as it relates to the scope, size, and/or complexity of the RFQ."  AR 1114.  Then, for evaluation subfactor 1B (Past Performance), quoters had to "request that all their cited similar experience references . . . submit written evaluations of their past performance to [Census] no later than the final quote submission date and time."  AR 1116 (RFQ § L.6.2.2).

For evaluation subfactor 2A (Management Approach for BPA), the RFQ required quoters to

4

> [D]escribe how the Quoter plans to manage the overall BPA, as well as each Call Order to be issued under this BPA. Quoters shall detail[] how the Quoter plans to communicate with Census Bureau management; describe the policies, procedures, and techniques to be employed to assure cost-effective and quality performance; and [describe] the Quoter[']s approach to meet the requirements delineated in Section C.4 — Scope of this BPA.

AR 1117 (RFQ § L.6.3.1).

For evaluation subfactor 2B (Key Personnel), quoters had to identify specific individuals to fulfill the following three roles: (1) project manager; (2) TSCoE lead subject matter expert; and (3) lead tools administrator. AR 1068 (RFQ § H.2) (Key Personnel); AR 1117–18 (RFQ § L.6.3.2); AR 754 (RFQ Amend. 001) (correcting the list of key personnel); AR 1014 (RFQ Amend. 003) (further correcting the key personnel list). In addition to providing a resume for each proposed key personnel, quoters had to include "a description of the roles and responsibilities of the individual and discussion of the appropriateness of his/her skills and experience to successfully fulfill the requirements outlined in Section C of the BPA." AR 1118 (RFQ § L.6.3.2).

For evaluation factors 3 and 4, quoters had to submit a technical approach for Call Orders 0001 and 0002, respectively. AR 1118–19. For Call Order 0001, quoters had to "propose[] [a] technical approach for accomplishing the requirements within Call Order 0001 (Attachment J.12)." AR 1118 (RFQ § L.6.4). Such "detailed plans" had to "demonstrate a clear understanding of the requirements and the challenges associated with this work and the Quoter[']s role in providing technical support as specified in the defined objective within the Call Order requirements." AR 1118 (RFQ § L.6.4). In particular, quoters had to "[c]learly and [c]oncisely describe a complete approach to setting up, implementing and running a TSCoE," amongst other activities. AR 1118. Quoters had to provide similar information "for accomplishing the requirements within Call Order 0002 (Attachment J.13)." AR 1119 (RFQ § L.6.5). Specifically, quoters had to submit a "clear and concise approach to how the contractor will ensure that all tools that support work in this Call Order will follow the TSCoE standards, processes, procedures, etc. established and maintained in Call Order 0001." AR 1119 (RFQ § L.6.4). The RFQ cautioned that "[t]he Government intends to execute a BPA and immediate[ly] award Call Order 0001 and Call order 0002 without further communicating with Quoters." AR 1108 (RFQ § L.1).

Evaluation factor 5 covers the pricing volume, for which quoters had to submit a completed price quotation worksheet. AR 1119–20 (RFQ § L.7) (referencing Attachment J.1 — Price Quotation Worksheet). The price volume had to be submitted "separate[ly]

from the technical quote as part of the[] proposal package" and had to "consist of overall pricing for the BPA to include Quoter[']s proposed labor categories and a description for each GSA MAS IT labor category anticipated to be used under this BPA." AR 1120 (RFQ § L.7). Thus, the quoted pricing had to "consist of pricing for the BPA," generally, "and pricing for . . . Call Order 0001 and Call Order 0002 included with this solicitation." AR 1120 (RFQ § L.7.1). The Call Order 0001 pricing worksheet required "a Firm Fixed Price for each line item for [each] performance period." AR 1121 (RFQ § L.7.1.2); AR 1147 (RFQ Attach. J.1). The Call Order 0002 worksheet, on the other hand, required "Labor Rates and Total [time and materials] Price[s] for each performance period" based only on "the Labor Categories and Hours provided" in the worksheet. AR 1121–22 (RFQ § L.7.1.3); AR 1148 (RFQ Attach. J.1).

The RFQ instructed quoters that "[t]he Government is in need of labor categories that are comparable to the BPA Roles outlined in Attachment J.1 — Price Quotation Worksheet and Attachment J.2 — Labor Category Descriptions" and that, "[f]ollowing award, Attachment J.1. — Price Quotation Worksheet — will become the Master BPA Rate Card and shall be the basis for Call Order pricing." AR 1015–16 (RFQ § B.3.1) ("Labor Rates (Rate Card)"). Thus, the labor rates "submitted in Attachment J.1 — Price Quotation Worksheet shall be used by the Contractor as the maximum allowable ceiling on labor rates when submitting price quotes in response to Call Order requests issued under this BPA." AR 1016 (RFQ § B.3.3).

Section M provided further details on the evaluation factors for this best value procurement:

> The Census Bureau's evaluation will be based on Best Value principles. Accordingly, an award will be made to the responsible ***and technically acceptable*** Quoter whose quote provides the greatest overall value to the Government, price and all other factors considered. This best value determination will be accomplished by comparing the value of the differences in the technical factors for competing offers, based on their strengths, weaknesses, and risks, and with differences in their price to the Government. In making these comparisons, the Government is more concerned with obtaining superior technical capabilities than with making an award at the lowest overall price to the Government. Quoters are advised that the technical evaluation factors are significantly more important than price.

AR 1124 (RFQ § M.1.1) (emphasis added); *see also* AR 1131 (RFQ § M.4). The agency intended to make an award "based on initial quote submissions" but reserved the right to initiate a "dialogue with one or more Quoters" and to request revised quotes.

6

AR 1124–25 (RFQ § M.1.1); *see also* AR 1108 (RFQ § L.1) (reserving "the right to communicate with only [the best-suited] Quoter to address any remaining issues").

The RFQ weighted all technical factors and subfactors equally and "when combined [they] are significantly more important that the Price Factor." AR 1124; *see also* AR 1125 (RFQ § M.2) ("Factors 1, 2, 3 and 4 are of equal importance. Subfactors within each technical factor are of equal importance within that factor. All Technical Factors when combined are significantly more important than the Price Factor.").

The RFQ required evaluators to assess quotes for significant strengths, strengths, weaknesses, and significant weaknesses. AR 1125–26 (RFQ § M.2.1). A significant strength "is an element of the proposal which <u>substantially enhances</u> the merit of the quote or substantially exceeds specified performance or capability requirements in a way that will be highly beneficial to the Government during BPA or Call Order performance." AR 1125. A strength "is an element of the quote that <u>has merit or exceeds specified performance</u> or capability requirements in a way that will be advantageous to the Government during BPA or Call Order performance." AR 1125. A weakness "is a flaw in the quotation that <u>increases the risk</u> of unsuccessful BPA or Call Order performance." AR 1126. A significant weakness "is a flaw in the quote that <u>substantially increases the risk</u> of unsuccessful BPA or Call Order performance." AR 1126.

Additionally, Census had to assess quotes for risk — *i.e.*, "the potential for unsuccessful BPA or Call Order performance" — using the following levels:

> High — likely to seriously disrupt the schedule, increase the price, or degrade the performance[;]
>
> Moderate — potentially cause some disruption of schedule, increase the price, or degrade the performance[;]
>
> Low — little potential to disrupt schedule, increase price or degrade performance.

AR 1126 (RFQ § M.2.1).

With respect to the first evaluation factor, similar experience and past performance, the RFQ required Census to "determine if the Quoter's experience is appropriate for supporting organizations, programs, and/or projects with similar size, scope and complexity" by "determin[ing] the similarity and comprehensiveness of the Quoter['s] experience." AR 1127–28 (RFQ § M.2.2). Census committed to "evaluat[ing] the submissions to determine whether the Quoter consistently delivers quality services in a timely and cost-effective manner." AR 1127 (RFQ § M.2.2). If a quoter lacked

evaluations from similar prior experiences, Census would give that quoter a "Neutral" evaluation for the past performance subfactor.  AR 1127.

For the remaining technical evaluation factors, the RFQ detailed several areas for Census to check for strengths, weaknesses, and risks.  AR 1128–30 (RFQ §§ M.2.3–2.5). For example, Census needed to review the Call Order 0001 technical approach to see if the quoter, among other things, "demonstrate[d] a complete understanding of the [agency']s[] requirements and the Quoter[']s[] role" and "describe[d] a complete approach to setting up, implementing and running a TSCoE."  AR 1129–30 (RFQ § M.2.4).  The RFQ further separated the evaluation of the general BPA technical approach into two subfactors:  (1) management approach and (2) key personnel.  AR 1128–29 (RFQ § M.2.3). For the three roles the RFQ identified as key personnel, the RFQ required USCB to "evaluate the information contained in the resumes submitted with the quote . . . based on the extent to which personnel . . . meet, or exceed, skills, experience and education required in performing the work."  AR 1128–29.  Such an assessment included determining if proposed key personnel "meet minimum labor category requirements." AR 1129; *see also* AR 1016 (RFQ § B.3.1) (referring to Attachment J.2 for labor category descriptions).

For the fifth evaluation factor, price, RFQ Section M.3 provided that Census "will review the price schedules for completeness and accuracy" and that "[a] determination will be made as to whether the Quoter has properly understood the price quote instructions as specified in Section L and properly completed the rate schedules." AR 1130 ("The . . . quote will be checked for mathematical correctness[.]").  This assessment also tasked Census with "determin[ing] . . . whether the price appears unbalanced either for the total price of the quote or [for] separately priced line items." AR 1130–31 (RFQ § M.3).  The RFQ defined an "unbalanced quote" as "one that incorporates prices that are less than cost for some services and/or prices that are overstated for other services."  AR 1131 (RFQ § M.3).

On July 20, 2021, Ekagra and Paradyme submitted timely proposals.  AR Tabs 18–19.  Two other quoters, [ * * * ] and [ * * * ], also submitted quotes.  AR 2278 (Award Memorandum).

### B.  USCB's Evaluation, Corrective Action, Reevaluation, and Contract Award

On September 22, 2021, Census made an initial BPA award to Paradyme.  AR 1650 (Notice of Contract Award to Paradyme).  On September 23, 2021, Census notified Ekagra of the contract award to Paradyme.  AR 1821 (Notice to Ekagra — Unsuccessful Offeror).

As a result of a bid protest pre-filing notification made in this Court on October 8, 2021, the government decided to take corrective action, to include issuing a stop work order, "[c]onducting a re-evaluation of award documentation with the new Contracting

Officer," and "[m]aking an award decision based on the results of the new evaluation." AR 1911–12 (Corrective Action Notice to Offerors / Request for Quote Validation).[4] Census advised both Ekagra and Paradyme (and the two other quoters) that Census would initiate "a secondary evaluation of [the] submitted quote[s]." AR 1911–13 (noting that Census "has informed all the vendors (4) that submitted proposals . . . that the USCB would under[take] a secondary evaluation of their initial quote submission").

As part of corrective action, the USCB technical evaluation team ("TET") issued a new consensus report on April 4, 2022. AR 2183–2239. The TET ranked Paradyme in first place for its technical quotation because Paradyme "provided an adequate solution that met all of the solicitation requirements," including "a few strengths, [and] no weaknesses or risks overall compared to the other three vendors who all had significant weaknesses and high risks." AR 2231–32; see also AR 2237 ("Paradyme's quotation provides the required support at no risk to the Government compared to the other vendors; all of whom had significant weaknesses and high risks.").

In contrast, the TET determined that "Ekagra's quote was technically unacceptable" based on its "three significant weaknesses and high risks." AR 2238. The TET similarly concluded that the other two quoters were technically unacceptable because of their respective significant weaknesses and high risks. AR 2238–39. Overall, the TET assessed the quoters as follows:

| TET Evaluation | Quoter | | | |
|---|---|---|---|---|
| Finding | Paradyme | Ekagra | [ * * * ] | [ * * * ] |
| Strengths | 3 | 3 | 7 | 8 |
| Weaknesses | 0 | 1 | 1 | 1 |
| Significant Weaknesses | 0 | 3 | 6 | 7 |

AR 2231–39. All quoters received strengths, but only Paradyme received no weaknesses and no significant weaknesses. AR 2237–39.

The price evaluation team ("PET") also issued its reevaluation report on April 4, 2022. AR 2240-2254. The report examined each quote's total price for each of the RFQ's

---

[4] See also AR 1913 (Correction Action Notice to Technical and Price Evaluation Teams) ("During the reevaluation, USCB [technical] and [pricing evaluation] teams would be able to thoroughly review the proposal again in its entirety."); AR 1919 (Memorandum for Evaluation Team) ("Due to a Pre-filing Notice of Protest submitted at the Court of Federal Claims on October 8, 2021, . . . it was determined[] Census would conduct corrective action of this procurement.").

two call orders.  For Call Order 0001, Paradyme's total evaluated price[5] of $259,664.26 was a small fraction of the other quotes, including Ekagra's evaluated price of $[ * * * ] (the highest of the quoters).  AR 2253.  For Call Order 0002, Ekagra submitted the lowest price quote at approximately $[ * * * ] million; Paradyme's quoted price was approximately $[ * * * ] million higher than Ekagra's.  AR 2254.  The PET concluded that both Ekagra and Paradyme "understood the price quote instructions as specified in Section L and did accurately complete Attachment J.1-Price Quote worksheet."  AR 2242–43.  The PET further concluded that "[c]omputations for all four price quotes were correct" and "were summarized correctly."  AR 2243.

Although the PET observed that "Paradyme's offer for Call Order 0001 is unbalanced," AR 2246, the PET did not identify any performance risks; nor was the PET concerned that Census somehow would end up paying more than Paradyme quoted.  That makes sense where, as here, the RFQ specified, AR 1121 (RFQ § L.7.1.2), that Call Order 0001 would be a firm fixed price contract, AR 2247.  Moreover, "through price analysis, the PET was able to determine that the offer from Paradyme is fair and reasonable," while acknowledging that "Paradyme's cost for Call Order 0001 is significantly less than the other offerors."  AR 2245.  The PET specifically addressed Paradyme's Call Order 0001 pricing, explaining that Paradyme "provided information above and beyond what was required in the Solicitation[.]"  AR 2245.  Accordingly, "with further analysis [the PET] w[as] able to determine" how Paradyme proposed achieving the savings.  AR 2245; *see also* AR 2248 (explaining in detail how Paradyme's "overall price to the Government for Call Order 0001 . . . was clearly supported").

On April 25, 2022, the contracting officer issued his best value determination.  AR 2258–66.  After providing a detailed tradeoff analysis, the contracting officer agreed with the TET that "[b]ased on Ekagra's three significant weaknesses and high risks, . . . Ekagra's quote was technically unacceptable" whereas "Paradyme's technical quote had no weaknesses or risks and would meet the government's requirements."  AR 2263–64; AR 2258 ("I have reviewed the TET's findings and ranking, the PET report, and agree with the contents therein.").

The reason for Ekagra's technical unacceptability is well explained in the record:

> Ekagra was ranked below Paradyme due to the ***three significant weaknesses and high risks that spanned across two different factors: Factor 2B: Key Personnel and Factor 4: Call Order 0002***.  Ekagra proposed key personnel that failed to meet minimum requirements, which will be extremely

---

[5] "The total evaluated price of Call Order 0001 was calculated using the total price for the Base Period, Four (4) One-year Option Periods, and One (1) Six (6) Month Extension."  AR 2247; *see also* AR 2288 (Award Memorandum) (same).

detrimental to the Government and may cause the contractor to be unable to support day to day activities.

Ekagra also had *a significant weakness and high risk for not providing details on how the integrity of the security baselines will be maintained,* which may cause unsecured systems, exposure of title data, and audit findings that would cause tools to be completely unavailable for mission critical work. In addition, for Factor 2A: Management Approach, Ekagra had a weakness and moderate risk for not describing their retention strategy to reduce vacancies, which may result in delays in the customer schedules and deliverables, quality issues from staff burn out, and tools support to miss standards as stated in the service level agreements.

AR 2285–86 (Award Memorandum) (emphasis added) ("Based on Ekagra's three significant weaknesses and high risks, the TET determined that Ekagra's quote was technically unacceptable.").

Accordingly, the contracting officer determined that "Paradyme was the *only* Offeror that addressed and met every requirement identified in the solicitation, thus demonstrating a full understanding of the requirements in their technical quote and had no weaknesses or risks identified." AR 2258 (emphasis added). Reviewing Paradyme's technical approach to Call Order 0001, the contracting officer explained that Paradyme's unique "approach led to Paradyme's significantly reduced cost compared to the other Offerors" and the Independent Government Cost Estimate ("IGCE"). AR 2264 (noting that Paradyme's "combination of strategies meets the Government's requirements, while providing a significant cost savings for Call Order 0001"); *see also* AR 2265 (discussing Paradyme's "approach [which] led to Paradyme's significantly reduced cost compared to the other Offerors and the IGCE").

For Call Order 0001, the contracting officer "determined that the lower price of the #1 Technically Ranked Paradyme quote is the best value." AR 2265. Similarly, because "Paradyme's [Call Order 0002] technical quote had no weaknesses or risks and would meet the Government's requirements," AR 2265, the contracting officer concluded that Paradyme's proposal justified paying more for Call Order 0002, as compared to Ekagra's quote for Call Order 0002. AR 2265. Census concluded that, in the aggregate, Paradyme represented "the best value to the Government, price and other factors considered for the . . . requirement." AR 2266.

On April 25, 2022, Census informed Ekagra that, following the corrective action and reevaluations, Paradyme remained the selected contract awardee. AR 2267 (Notice to Ekagra — Unsuccessful Offeror). The next day, USCB instructed Paradyme to resume

work under the BPA and call orders.   AR 2271 (Notice to Paradyme — Resume Performance).

### C.  GAO Protest

On May 3, 2022, Ekagra filed a post-award protest with the Government Accountability Office ("GAO") challenging USCB's decision to award the contract to Paradyme.  AR 2323.  Ekagra presented several grounds of protest and argued USCB "overlook[ed] or discount[ed] [Paradyme's] technical risk and unbalanced, irregular, and unreasonable pricing while also assigning weaknesses to Ekagra's proposal for phantom requirements."  AR 2323, 2337–56.

On August 9, 2022, the GAO ultimately concluded "that the agency reasonably evaluated [Ekagra's] key personnel and the technical approach for call order 0002, finding them inadequate and Ekagra's quotation technically unacceptable."  AR 2855; *Ekagra Partners, LLC*, B-420733, 2022 CPD ¶ 220, 2022 WL 4236223, at *3 (Comp. Gen. Aug. 9, 2022).  As a result, GAO held that "Ekagra is not an interested party" with regard to its remaining protest grounds, and dismissed those grounds without reaching their merits.  AR 2855.

### D.  Ekagra's Complaint

On August 22, 2022, Ekagra filed its initial complaint in this Court pursuant to 28 U.S.C. § 1491(b), challenging USCB's award of the BPA and call orders to Paradyme.  ECF No. 1.  The next day, Paradyme filed an unopposed motion to intervene in the action, ECF No. 10, which this Court granted, ECF No. 11.  On September 23, 2022, Ekagra filed its amended complaint.  ECF No. 26 ("Am. Compl.").

Ekagra alleges that Census — in awarding the procurement to Paradyme — made five errors.

In **Count One**, Ekagra asserts that Census botched its evaluation of Ekagra's past performance by failing to evaluate a particular past performance reference.  Am. Compl. ¶¶ 71–77 (Count One).  According to Ekagra, "[h]ad [Census] properly evaluated all of Ekagra's past performance submissions, it would have received a second strength and would have had more strengths than Paradyme under the past performance factor."  *Id.* ¶ 77.

In **Count Two**, Ekagra avers that Census unreasonably assigned Ekagra a weakness due its failure to adequately explain its retention strategy to minimize personnel turnover.  Am. Compl. ¶¶ 78–84 (Count Two).  Ekagra asserts that it explained its retention strategy and that, in any event, it is similar to Paradyme's proposal, which Census did not evaluate as a weakness.  *Id.* ¶¶ 81–84.

In **Count Three**, Am. Compl. ¶¶ 85–94, Ekagra challenges the significant weaknesses it received "for its purported failure to meet the Solicitation's requirements for its Lead Tools Administrator and Project Manager" — both key personnel positions, *id.* ¶ 86. Ekagra maintains that "[i]f not for the Agency's arbitrary, irrational and unreasonable evaluation of Ekagra's key personnel, it would have received two fewer significant weaknesses and would have had a much higher chance at receiving award." *Id.* ¶ 94.

In **Count Four**, Am. Compl. ¶¶ 95–101, Ekagra asserts that Paradyme's approach to Call Order 0001 is not technically acceptable because Paradyme merely "relied on its experience with the previous TSCoE" and thus "failed to address the Solicitation's express requirement for a new TSCoE," *id.* at ¶ 100 (emphasis omitted). Ekagra thus concludes that Paradyme "should have been found to be unawardable." *Id.* ¶ 101.

The particulars of **Count Five** are not entirely clear, but the core assertion is that while Census concluded that Paradyme's pricing was unbalanced, Am. Compl. ¶ 109, "the contracting officer did not consider whether [Paradyme's pricing] constituted a risk or whether the Agency would pay unreasonably high prices for contract performance," *id.* ¶ 111.

On September 23, 2022, Ekagra filed a motion for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). ECF No. 27 ("Pl. MJAR"). On October 7, 2022, the government and Paradyme each filed a timely cross-MJAR and response to Ekagra's MJAR. ECF No. 29 (USCB's MJAR); ECF No. 30 (Paradyme's MJAR). Two weeks later, Ekagra filed a timely combined reply and response brief. ECF No. 33 ("Pl. Resp."). On October 28, 2022, the government and Paradyme each filed a timely reply brief. ECF No. 34 (USCB's reply); ECF No. 35 ("Def.-Int. Rep.").

On November 8, 2022, the Court held oral argument on the parties' cross-MJARs. ECF No. 37 ("Tr.").

## II.    JURISDICTION

The Tucker Act provides that an "interested party" may file an "action" in this Court "objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [2] to a proposed award or [3] the award of a contract or [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see also Aero Spray, Inc. v. United States*, 156 Fed. Cl.

548, 559 & n.18 (2021) ("Section 1491(b) actions are typically referred to as 'bid protests.'").[6]

"Standing is an integral part of jurisdiction." *Seventh Dimension, LLC v. United States*, 160 Fed. Cl. 1, 14 (2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The party invoking federal jurisdiction bears the burden of establishing standing." *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002)). "Where a plaintiff lacks standing, its case must be dismissed pursuant to RCFC 12(b)(1)." *Aero Spray, Inc.*, 156 Fed. Cl. at 556 (citing *Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003)).

To establish standing in a § 1491(b) action, a plaintiff must demonstrate that it is an "interested party." *Aero Spray, Inc.*, 156 Fed. Cl. at 559 ("[T]he Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, . . . defines not only this Court's jurisdiction over *what* actions may be brought against the government, but also *who* has standing to pursue them."). In a pre-award protest action — typically involving a challenge to the terms of a solicitation — a plaintiff must allege facts that "demonstrate[] a 'non-trivial competitive injury which can be addressed by judicial relief.'" *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1362 (Fed. Cir. 2009) (quoting *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998); *see also Aero Spray, Inc.*, 156 Fed. Cl. at 562 (explaining that "[t]he Federal Circuit . . . modified that post-award standing test for pre-award cases" because "applying the [post-award] 'substantial chance' test makes little or even no sense" where "an agency is in the early stages of the procurement process and potential offerors have not even submitted proposals yet"). In a post-award protest action, such as in this case, an "interested party" is "[1] an actual or prospective bidder or offeror [2] whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2)).

Irrespective of the applicable "interested party" test, "the question of prejudice goes directly to the question of standing," and thus "the prejudice issue must be reached before addressing the merits." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). In that regard, "a plaintiff must allege *facts* — not mere conclusory assertions of law — demonstrating prejudice." *Vanquish Worldwide, LLC v.*

---

[6] *Cf. Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 96–97 (2020) ("[A]lthough '[the Administrative Dispute Resolution Act] covers *primarily* pre- and post-award bid protests,' the Federal Circuit in *RAMCOR* explicitly reversed this Court's determination 'that a [plaintiff] could only invoke § 1491(b)(1) jurisdiction by including in its action an attack on the merits of the underlying contract award' or the solicitation." (third alteration in original) (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999))).

*United States*, -- Fed. Cl. --, 2022 WL 17087798, at \*10 (Fed. Cl. Nov. 10, 2022) (citing *Blue Origin Fed'n, LLC v. United States*, 157 Fed. Cl. 74, 89 (2021)); *see also Blue Origin Fed'n, LLC*, 157 Fed. Cl. at 89 ("[T]he court must decide whether those alleged facts show the protestor was prejudiced by the alleged errors." (citing *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996))).[7]

    To succeed on the merits, however, a plaintiff must prove not only that the government erred — *i.e.*, that it acted arbitrarily, capriciously, or contrary to law — but also that any such error was prejudicial. *See Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 287–88 (2022) ("In order to be successful in a bid protest, a protestor must establish prejudice twice. First, it must establish prejudice as part of the standing inquiry. . . . Second, a protestor must also establish prejudice as part of its case on the merits. . . . On the merits of a bid protest, it is not enough to show that an agency has stepped out of bounds; rather, a protestor must further show that the offending agency's conduct prejudiced it."); *L-3 Commc'ns Corp. v. United States*, 99 Fed. Cl. 283, 289 (2011) ("[T]he prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true."). In other words, a plaintiff ultimately must do more than demonstrate that the government made errors in an evaluation or violated the terms of a solicitation or the FAR (or a statute); rather, a plaintiff must prove that such errors or violations actually prejudiced the plaintiff.[8]

---

[7] "The Court assumes the *facts* alleged in a plaintiff's complaint are true for the purposes of evaluating standing but not for the purpose of resolving whether a plaintiff has demonstrated prejudice on the merits." *Vanquish Worldwide, LLC*, 2022 WL 17087798, at \*10 (citing *Blue Origin Fed'n, LLC*, 157 Fed. Cl. at 89); *see also VAS Realty, LLC v. United States*, 26 F.4th 945, 950 (Fed. Cir. 2022) (explaining that, for the purposes of standing, "a court is required to accept as true all factual allegations pleaded" (quoting *Frankel v. United States*, 842 F.3d 1246, 1249 (Fed. Cir. 2016))); *Blue Origin Fed'n, LLC*, 157 Fed. Cl. at 89 ("For the limited purpose of determining whether it has standing, a protestor's allegations are assumed to be true." (citing *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 226 (Fed. Cir. 2019))); *Am. Relocation Connections*, 789 F. App'x at 226 ("For standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions."); *Yang Enters., Inc. v. United States*, 156 Fed. Cl. 435, 444 (2021) ("The Court assumes well-pled allegations of error to be true for purposes of the standing inquiry.").

[8] In this Court's recent decision in *Ahtna Logistics, LLC*, for example, the Court concluded that the plaintiff in that case was an interested party with standing because the complaint included "factual allegations that, if proven, would support a finding of prejudice." 2022 WL 17480642, at \*8. Even so, that same plaintiff not only failed to demonstrate that the government erred but also, in the alternative, failed to demonstrate that any of the putative errors would have prejudiced the plaintiff given its relative position in the agency's final evaluation of proposals. *Ahtna Logistics, LLC*, 2022 WL 17480642, at \*21–24.

While neither the government nor Paradyme argues that Ekagra lacks standing as an interested party, this Court has an independent duty to ascertain whether it possesses jurisdiction to decide Ekagra's claims, including whether Ekagra has standing to pursue them. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" (alteration in original) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984))); *see also* RCFC 12(h)(3).

There is no dispute that Ekagra "is an actual bidder," Am. Compl. ¶ 5, but Ekagra's assertion that "it had a substantial chance of receiving the [contract] award" but for the government's alleged errors, *id.* ¶ 7, is purely conclusory; Ekagra must allege *facts* that, if proven, would demonstrate prejudice. After reviewing the amended complaint for such factual allegations, the Court determines that Ekagra is an "interested party" pursuant to 28 U.S.C. § 1491(b) with standing to pursue only Counts Three, Four, and Five.[9]

With respect to Count One, the fatal problem in terms of prejudice for standing is that Ekagra asserts only that, had Census "properly evaluated all of Ekagra's past performance submissions, it would have received a second strength and would have had more strengths than Paradyme under the past performance factor." Am. Compl. ¶ 77. Ekagra makes no effort, however, to allege *facts* that show how or why such an improved past performance rating would have made a difference in USCB's ultimate award decision, a legally significant failure given that Census evaluated Ekagra's proposal as having "one weakness[] and *three significant weaknesses*." Am. Compl. ¶ 66 (emphasis added). Accordingly, even assuming the truth of the factual statements in Count One, this Court cannot conclude that Ekagra would be entitled to relief.

Count Two suffers from a similar defect. There, Ekagra alleges only that Census should not have assigned Ekagra a weakness for its employee retention strategy. Am. Compl ¶ 84. Again, however, Ekagra makes no effort to show how or why the removal of a single weakness would make any difference in USCB's ultimate contract award decision. In other words, Ekagra's proposal still would suffer from "three significant

---

[9] The Court notes that a plaintiff must show prejudice for standing (and ultimately prove prejudice on the merits) for each allegation of agency error (or some discrete collection of errors). In that regard, Ekagra's amended complaint also contains a separate count purporting to describe why "Ekagra Was Prejudiced." Am. Compl. ¶¶ 112–16 (Count Six). The issue of prejudice, however, is not itself an allegation of error and thus is not properly labeled as a separate count. Moreover, in Count Six, all of Ekagra's prejudice allegations are conclusory, and the Court does not assume their truth. Similarly, with respect to prejudice *on the merits*, Ekagra's MJAR argues that "[t]he Agency's errors prejudiced Ekagra," but that section merely summarizes caselaw and contains only conclusory statements. Pl. MJAR at 32–33. Ekagra's reply and response brief also relies upon a skeletal assortment of conclusory statements to argue that "Ekagra's proposal . . . should have been selected for award." Pl. Resp. at 13–14. As discussed *infra*, these statements, with little to no support in the administrative record, do not demonstrate prejudice on the merits.

weaknesses." *Id.* ¶ 66.  In the absence of other alleged facts suggesting the possibility of a different award decision but for the putatively erroneous weakness, Ekagra's complaint does not demonstrate prejudice, for standing purposes, for Count Two.

In sum, at least for Count One and Count Two, Ekagra's failure to allege *facts* demonstrating prejudice means that Ekagra lacks standing to pursue those counts and, thus, this Court lacks jurisdiction to decide them.  *See* RCFC 12(h)(3); *ZeroAvia, Inc. v. United States*, 160 Fed. Cl. 505, 510 (2022) ("Because the Court finds that [Plaintiff's] allegations of procurement errors do not contain sufficient factual support to demonstrate that it had a substantial chance of receiving an award, [Plaintiff] fails to meet its burden to establish that it has standing."); *cf. Todd Constr., L.P. v. United States*, 656 F.3d 1306, 1316 (Fed. Cir. 2011) ("[Plaintiff] has alleged nothing to indicate that the outcome of the performance evaluations would have been any different if the purported procedural errors had not occurred. . . . Therefore, [Plaintiff] lacks standing to sue [for this claim].").

The remaining counts provide sufficient details to establish prejudice for the purposes of standing — albeit barely.  Count Three, for example, alleges that but for USCB's erroneous assignment of two significant weaknesses for Ekagra's key personnel, it "would have had a much higher chance at receiving award."  Am. Compl. ¶ 94.  As with Counts One and Two, Ekagra does not allege facts in Count Three that, if proven, demonstrate a "higher chance" of award.  Nor does a "higher chance" equate to a "not insubstantial chance" of an award; trivial odds that are doubled may still be trivial.  Nor, for that matter, does Ekagra deal with the fact that even if it prevails on Count Three, Ekagra would still suffer from a remaining significant weakness.  *See* Am. Compl. ¶ 66. Would the removal of two significant weaknesses be sufficient to fundamentally undermine the foundations of the government's best value decision here?  Or would the remaining significant weakness mean that Ekagra loses in any event?  Ekagra's amended complaint does not answer those questions with alleged *facts*.  Nevertheless, the Court concludes that, reading the complaint as a whole, Ekagra has alleged sufficient facts to demonstrate prejudice for the purposes of standing for Count Three.  *Cf. Ascendant Servs., LLC*, 160 Fed. Cl. at 287–88 ("[I]t appears obvious that if Plaintiff were successful on *all* of its challenges to the [agency's] evaluation it would have a substantial chance of award and thus the prejudice threshold for standing purposes has been satisfied.").

Ekagra demonstrates prejudice for standing purposes in Count Four of its amended complaint because if Paradyme "is not technically acceptable" and "should have been found . . . unawardable," Am. Compl. ¶ 101, there is a substantial chance that Ekagra would be back in the hunt for an award — particularly given Ekagra's allegation that it was ranked second for the technical evaluation, *id.* ¶ 58.  *VAS Realty, LLC v. United States*, 26 F.4th 945, 949–51 (Fed. Cir. 2022) (holding that where a plaintiff demonstrates that an awardee's "ineligibility for the award . . . result[s] [in the] need for [an agency] to rebid the contract," the plaintiff has standing because "assuming its protest is successful,

it would have an opportunity to participate in a new procurement" (citing *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353 (Fed. Cir. 2015))).

Finally, for Count Five, Ekagra does not explain with any degree of precision how it is prejudiced by USCB's alleged failure to assess risk from unbalanced pricing. Nevertheless, the Court is reasonably able to discern the general thrust of Ekagra's complaint: if the contracting officer properly had considered such risk — *i.e.*, "whether the Agency would pay unreasonably high prices for contract performance," Am. Compl. ¶ 111 — Census would not have selected Paradyme for award.

Accordingly, the Court concludes that Ekagra possesses standing to maintain its action because the amended complaint contains sufficient factual allegations in Counts Three, Four, and Five. Whether Ekagra has proven prejudicial errors via its MJAR briefing (and oral argument) is a *merits* question, which the Court addresses below.

## III.    STANDARD OF REVIEW

Judgment on the administrative record, pursuant to RCFC 52.1, "is properly understood as intending to provide for an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The Rule requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record." *Id.* at 1354. Accordingly, this Court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence contained in the administrative record. *Id.* at 1356–57.

Generally, in an action brought pursuant to § 1491(b) of the Tucker Act, the Court reviews "the agency's actions according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706." *See Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019). That APA standard, in turn, requires the Court to determine "whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (citing 5 U.S.C. § 706(2)). In other words, the Court must "determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Id.* (quoting *Weeks Marine, Inc.*, 575 F.3d at 1358). "When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (internal citation marks omitted). "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

"In applying the APA standard of review, this Court affords considerable deference to an agency's procurement decisions." *IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 286 (2022) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)). In particular, protests involving "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). Thus, in reviewing an agency's procurement decision, the Court shall merely "determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Impresa*, 238 F.3d at 1332–33 (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). Accordingly, the Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citing *Colo. Interstate Gas Co. v. Fed. Power Comm'n*, 324 U.S. 581, 595 (1945)). "On the other hand, the Court will not put words in an agency's mouth or invent supporting rationales the agency has not itself articulated in the administrative record; *post hoc* explanations for agency decisions ordinarily will be rejected." *IAP Worldwide Servs.*, 159 Fed. Cl. at 286.

To establish prejudice on the merits in a post-award challenge, a plaintiff must show with record evidence that, but for the agency's error, "the protestor's chance of securing the award [would] not have been insubstantial." *Info. Tech. & Applications Corp.*, 316 F.3d at 1319; *see also Oak Grove Techs., LLC v. United States*, 155 Fed. Cl. 84, 98 (2021) (discussing standard of review and prejudice requirements).

## IV. DISCUSSION

### A. Census Reasonably Evaluated Ekagra's Proposed Key Personnel (Count Three)

Ekagra argues that Census improperly "inject[ed] [RFQ] Attachment J.2 into [the] evaluation criterion" for key personnel. Pl. MJAR at 23. In particular, Ekagra complains that Census improperly assigned two significant weaknesses to Ekagra because its proposed program manager and lead tools administrator — both key personnel positions — lacked experience with Agile software development. *Id.* at 22–23 (also challenging Ekagra's associated "high risk" evaluation); AR 1068 (RFQ § H.2) (identifying key personnel).[10]

---

[10] As explained in *Active Network, LLC v. United States*, "Agile software methodology is an alternative approach to traditional project management." 130 Fed. Cl. 421, 425 n.2 (2017); *see also Agile*, Carnegie Mellon Univ. Software Eng'g Inst., https://www.sei.cmu.edu/our-work/agile/ (last visited Dec. 15, 2022) ("Agile is an iterative approach to software delivery that builds and delivers software incrementally from the start of a project instead of trying to deliver it all at once near the end.").

Ekagra does not argue that its proposed project manager and lead tools administrator possess the Agile experience at issue.[11] Nor does Ekagra contend that RFQ Attachment J.2 lacks an Agile experience requirement for the two key personnel positions at issue. Thus, Ekagra's entire argument depends on the erroneous premise that Census could not properly consider the labor category descriptions specified in RFQ Attachment J.2, merely because Section M "doesn't use the word 'J.2.'" Tr. 16:21–23; *see also* Tr. 17:4-6 (arguing that Census could not consider Attachment J.2 because the RFQ did not "explicitly mention[] J.2"). The Court concludes that Ekagra's argument has zero merit.

As noted above, Section M.2.3 of the RFQ covers the evaluation of key personnel (subfactor 2B) for the BPA as a whole. AR 1128. The RFQ required Census to "evaluate the information contained in the resumes submitted with the quote." AR 1128. In doing so, Census had to base its evaluation "on the extent to which personnel submitted by the Quoter meet, or exceed, *skills, experience and education required in performing the work*." AR 1128–29 (emphasis added). The RFQ additionally specified that "[k]ey [p]ersonnel will be evaluated on[,]" among other criteria, "[k]nowledge, skills and abilities of the proposed key personnel *to meet minimum labor category requirements*." AR 1129 (emphasis added).

Ekagra maintains that Census could not consider the labor category requirements in Attachment J.2. *See* Pl. MJAR at 22 (arguing RFQ § M.2.3 does not "include" Attachment J.2). But Ekagra makes no effort to identify where else in the RFQ one might find "minimum labor category requirements." AR 1129. The only — and rather obvious — location for such requirements is in Attachment J.2, which is titled "Labor Category Descriptions." AR 1149; *see also* Pl. MJAR at 22 ("The Government is in need of labor categories that are comparable to the BPA Roles outlined in . . . Attachment J.2 — *Labor Category Descriptions*." (emphasis added) (quoting AR 1016 (RFQ § B.3.1))). For example, Attachment J.2 specifies that the "[a]nticipated [r]ole [r]equirements and [s]kills" of the project manager include "Knowledge of Agile and/or SAFe Frameworks — ***Minimum*** 2–3 years." AR 1149 (emphasis added). Reading the RFQ as a whole — which is the only way to read it correctly[12] — Census properly considered Attachment J.2 in evaluating Ekagra's proposal.

---

[11] Ekagra noted that its TSCoE subject matter expert had Agile experience, Pl. MJAR at 23, but the significant weaknesses concerned the other two people the quote identified as key personnel. AR 1166 (Ekagra Quote — Technical Volume) (identifying proposed key personnel).

[12] *See, e.g., Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1344 (Fed. Cir. 2021) ("We must consider the Solicitation as a whole and interpret 'it in a manner that harmonizes and gives reasonable meaning to all of its provisions.'" (quoting *Banknote Corp. of America, Inc.*, 365 F.3d at 1353)); *Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 696–97 (2022) (concluding that an RFQ attachment's requirements under "labor category descriptions" provided measures for assessing strengths, weaknesses, and risks).

Moreover, during oral argument, Ekagra all but acquiesced to the government's (and this Court's) reading of the RFQ:

> THE COURT: Where are those minimum labor category requirements?
>
> [EKAGRA COUNSEL]: We don't believe that they're in the solicitation, Your Honor. They're in J.2, which is not a requirement.
>
> THE COURT: . . . [B]ut where do I find them? . . . I mean, these mean something. There's no pre-award protest objecting to their ambiguity. Where are they?
>
> [EKAGRA COUNSEL]: There are labor category requirements in J.2.

Tr. 14:15–25; *see also* Tr. 16:8–14 (Ekagra agreeing that "J.2 is where there are minimum requirements" and that "agile experience[] [is a requirement] in both of the labor categories at issue"). At a minimum, then, Ekagra's reading of the RFQ suffers from a fatal timeliness defect pursuant to *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007). That is because Section M.2.3 requires that Census evaluate quotes against the "minimum labor category requirements." AR 1129. If Attachment J.2 cannot be employed for that purpose and Ekagra cannot identify any other source for such "minimum" requirements, then the RFQ is patently ambiguous. Ekagra cannot complain about such an ambiguity this late in the game. *See Blue & Gold Fleet*, 492 F.3d at 1313–14. Although Ekagra invokes "the rule of *contra proferentem*" to support its reading of the RFQ, Pl. Resp. at 7, "[t]he doctrine of patent ambiguity is an exception to the general rule of *contra proferentem*," *Blue & Gold Fleet*, 492 F.3d at 1313 (quoting *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1342 (Fed. Cir. 2004)). Thus, even if the RFQ were ambiguous, *contra proferentem* does not save Ekagra's argument.

Finally, in the alternative, the Court finds that Ekagra has not demonstrated prejudice *on the merits* of Count Three, even if Census erred in applying the RFQ's requirements. Ekagra pays prejudice scant attention in its briefs, making only two assertions regarding prejudice for this count. First, Ekagra argues that had Census properly evaluated Ekagra's proposed key personnel, it "would have received two less significant weaknesses and no high risks" for the key personnel evaluation subfactor. Pl. MJAR at 23–24. Thus, Ekagra reasons, it would have "increas[ed] its opportunity to receive [the] award." *Id.* at 24. Second, Ekagra asserts that "a proper evaluation would have resulted [in] different ratings" and, thus, the "best value analysis also would have changed." Pl. Resp. at 7.

At the outset, the Court notes that Ekagra cites no caselaw whatsoever supporting the proposition that prejudice can be proven merely by demonstrating that Ekagra should have received a better evaluation than it did — *i.e.*, without showing how that better evaluation might translate to the increased likelihood of contract award.  Although "the substantial chance requirement does not mean that [a] plaintiff must prove it was next in line for the award but for the government's errors[,] . . . [d]emonstrating prejudice does require . . . that the plaintiff show more than a bare possibility of receiving the award." *Precision Asset Mgmt. Corp. v. United States*, 125 Fed. Cl. 228, 233–34 (2016) (finding "no evidence on which to base a finding that [the] plaintiff had not only a chance to receive the award, but a *substantial* chance" when the plaintiff's success would leave a higher-rated, lower-cost alternative offer); *see Info. Tech. & Applications Corp.*, 316 F.3d at 1319 (concluding that, to establish prejudice on the merits in a post-award challenge, a plaintiff must show with record evidence that, but for the agency's error, "the protestor's chance of securing the award [would] not have been insubstantial"); *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 228 (Fed. Cir. 2019) ("[T]o prevail in its bid protest, [Plaintiff] must 'show a significant, prejudicial error in the procurement process, meaning it must show that there is a greater-than-insignificant chance" that the agency would have awarded the contract to the plaintiff "had [the agency] not committed the alleged errors." (quoting *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed. Cir. 1999))).[13]

Ekagra's primary difficulty in proving prejudice on the merits is that Census assigned an independent "significant weakness and high risk" to Ekagra's quote for the fourth evaluation factor: "Call Order 0002 Technical Approach."  AR 2262–63.  Indeed, the administrative record suggests that this finding was an entirely separate basis underpinning USCB's selection of Paradyme over Ekagra:

> For Call Order 0002, Ekagra had a significant weakness and high risk for not providing details on how the integrity of the baselines will be maintained, resulting in unsecured systems, exposure of title data, and audit findings that would cause tools to be completely unavailable for mission critical work. There are too many critical service risks for the Federal staff to mitigate, which would cause either a lapse in service or critical security risk.  These *significant weaknesses and high risks increase the overall risk of unsuccessful BPA and Call Order performance and is therefore not the best value to the Government.*

---

[13] *See also WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1380 (Fed. Cir. 2020) ("[A]n error in the TET report, standing alone, is not prejudicial. . . . To show prejudicial error, [Plaintiff] must show a 'substantial chance' that the [decisionmaker] . . . would have made a different award decision but for the alleged error[.]" (quoting *Info. Tech. & Applications Corp.*, 316 F.3d at 1319)).

> *Thus, Paradyme's quote for Call Order 0002 is the best value to the Government.*

AR 2263 (Contracting Officer Best Value Determination) (emphasis added) (explaining that "[w]hile Ekagra did propose the lowest price for Call Order 0002, Ekagra's technical quote has significant weaknesses and high risks, *especially* regarding the high risk associated with not describing how the integrity of the baselines will be maintained" (emphasis added)).  Moreover, the contracting officer found that "Paradyme's technical quote had no weaknesses or risks and would meet the government's requirements, thus justifying the increase in cost of $[ * * * ]" specifically for Call Order 0002.  AR 2263–64.

Given the Court's factual findings described above, Ekagra had the burden to demonstrate that eliminating its two significant weaknesses (and associated high risks) for key personnel would have undermined (1) the contracting officer's finding that Ekagra's quote was technically unacceptable, and, in turn, (2) the best value decision. Aside from conclusory assertions that Ekagra's position for award would have improved, however, Ekagra makes no effort to tackle the difficult questions regarding its technical acceptability or the contracting officer's willingness to pay Paradyme more than Ekagra's proposed price for Call Order 0002.  *See, e.g., Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 996–98 (Fed. Cir. 2021) ("[T]he challenger of [an] agency action generally bears the burden of showing that an error was harmful — that is, that it was prejudicial. . . . We hold that there is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision.  The protestor must show prejudice under the usual standard."); *Ahtna Logistics, LLC*, 2022 WL 17480642, at *8 ("To succeed on the merits, however, including prejudice, a plaintiff must prove its allegations."); *Ascendant Servs., LLC*, 160 Fed. Cl. at 288 ("On the merits of a bid protest, it is not enough to show that an agency has stepped out of bounds; rather, a protestor must further show that the offending agency's conduct prejudiced it."); *ACI Techs., Inc. v. United States*, 162 Fed. Cl. 39, 46 (2022) ("A plaintiff has the burden to prove prejudice and thus must offer an actual prejudice argument for all but the most self-obvious propositions[.]").

To be clear, the Court does not deny that Ekagra *perhaps* could have made a plausible prejudice argument on this record.  But Ekagra did not do so.  Having failed to prove that it was prejudiced by any error in the key personnel evaluation (even assuming the government made one), Ekagra cannot succeed on Count Three.

### B.  Census Reasonably Evaluated Paradyme's Call Order 0001 Quote (Count Four)

Unlike Ekagra's first three counts in its complaint that challenge USCB's evaluation of Ekagra's quote, Count Four challenges the evaluation of Paradyme's quote. In Count Four, Ekagra contends that Census should have found Paradyme's quote "unawardable" because:  (1) the RFQ required a "new TSCoE" under Call Order 0001 and

Paradyme's quote proposed building on its previous USCB work to perform that call order; and (2) Paradyme otherwise failed to demonstrate an understanding of the RFQ's requirements. Pl. MJAR at 24–26. This argument is devoid of support in the administrative record.

The primary premise of Ekagra's argument is that Paradyme's extensive work as an incumbent contractor is not relevant to the new BPA and call orders at issue. Ekagra thus contends that Paradyme did not provide an awardable quote because it "heavily relied on [Paradyme's] previous experience working on TSCoE." Pl. MJAR at 24.

Ekagra is partially correct: Paradyme did rely on its incumbent work for Census. For example, Paradyme included this previous work as one of its similar experiences. AR 1255–56 (describing that project as "the current incumbent work being competed" where Paradyme "helped [a part of Census] stand up [that project's] TSCoE"). Paradyme's quote further elaborated on what it had done for USCB's Enterprise Development Tools Support Branch ("EDTSB"):

> Since 2016, [Paradyme] has run and managed the [EDTSB TSCoE] . . . . The initial goal of the TSCoE was to assist the Branch in addressing the lack of *standardization of tools throughout the Census enterprise*. When the contract began, many of the tools used throughout the Census Bureau were in different versions, [and] implemented very differently . . . . [W]e have significantly improved the state of tools implementation at the Census, *standardizing the version and implementation of various tools deployed throughout the Bureau*.

AR 1279 (emphasis added); *cf.* AR 1021 (RFQ § C.2) ("The TSCoE objective is to provide processes, procedures, standards, policies, . . . and best practices[.]"); AR 677 (RFQ Attach. J.12) (listing several tasks the contract awardee "shall provide" for Call Order 0001 that involve EDTSB). And Census noted in its award decision that "[t]he Enterprise Tools requirement is currently being provided by Paradyme" under the previous work order. AR 2276 (Award Memorandum).

Ekagra is also correct that the RFQ obligated Census to assess Call Order 0001 quotes against Attachment J.12's requirements, *see* Pl. MJAR at 8, 24, including "the degree to which the Quoter's technical approach . . . demonstrates a clear understanding of the support required," AR 1129 (RFQ § M.2.4) (listing evaluation criteria). Attachment J.12, in turn, explained that "[t]he purpose of this Call Order . . . is to procure contractor services to plan, develop, implement and then manage a new TSCoE and provide [BPA-level] program and project management." AR 675 (RFQ Attach. J.12).

But the premise of Ekagra's argument does not prove its conclusion.  To the contrary, Census reasonably found that Paradyme's quote met the RFQ requirements.  In addition to describing Paradyme's previous Census TSCoE work, Paradyme explained that it would implement "the improved TSCoE . . . through the finalization and codification of [Paradyme's] processes," AR 1279 (Paradyme Quote — Technical Volume), apparently referring to Paradyme's incumbent work for the EDTSB.  Citing this section of Paradyme's quote, the contracting officer's best value determination noted Paradyme's plan to leverage its "existing artifacts" and "knowledge of USCB business," and concluded that "[t]his combination of strategies meets the Government's requirements, while providing a significant cost savings for Call Order 0001."  AR 2264.  The contracting officer's determination in that regard reflected the TET's earlier, similarly positive view of Paradyme's technical approach: "Paradyme provided a quotation with an approach that would . . . set up, implement and run a TSCoE. . . . Paradyme's proposed approach will provide the capabilities that meet the EDTSB's requirements." AR 2230–31 (Technical Re-Evaluation Consensus Report); AR 2265 (Contracting Officer Best Value Determination) (same).  The contracting officer's final award memorandum repeated those findings.  AR 2285.

Given this context, Ekagra attempts to manufacture a non-existent RFQ requirement: that the awardee must provide a completely new TSCoE, totally uninfluenced by, and having no connection with, USCB's (and Paradyme's) previous work.  Quoting the RFQ's references to a "new TSCoE" and the planned change to the TSCoE's organizational model, Ekagra argues that Paradyme's proposed use of materials from its existing USCB TSCoE work reveals Paradyme's quote would not deliver a "new" TSCoE.  Pl. MJAR at 24–26; Pl. Resp. at 7–8; Tr. 40:18–23 ("If the Government rejects the old center of excellence that Paradyme was using, . . . then using those documents [from the old center] . . . is not sufficient.  And the contracting officer did not grapple with that.").  But Ekagra makes an unsubstantiated leap from the RFQ's description of a new TSCoE structure — *i.e.*, siloed versus centralized, AR 1019–20 — to conclude that the RFQ demanded "an *all* new TSCoE," Pl. MJAR at 24 (emphasis added); *see also* Pl. Resp. at 8.  Ekagra's argument does not land for the simple reason that the RFQ does not impose some artificial firewall between USCB's and Paradyme's past work, on the one hand, and the new contract, on the other.  *See* AR 1021 (RFQ § C.2) ("The TSCoE will *migrate* Tools Administration, Support, and Services from the traditional 'silo' model to a centralized model.  Tools support functions will *move* . . . to a centralized model[.]" (emphasis added)); AR 1279 (Paradyme Quote — Technical Volume) (describing how Paradyme would improve the existing TSCoE).

Even Ekagra recognized that no part of the RFQ *barred* use of existing materials or prior work, and the agency had reasonable discretion to consider past work.  *See* Tr. 37:2–

13.[14]  As described above, Paradyme's proposal provided a reasonable basis on which the contracting officer determined that Paradyme's experience and related materials would help Paradyme implement the TSCoE per the RFQ's terms.

Ekagra's argument that Paradyme failed to demonstrate an understanding of the RFQ's requirements fares no better.  Ekagra cites Paradyme's allegedly "vague, non-specific, irrelevant plans" and Paradyme's comparatively low Call Order 0001 price.  Pl. MJAR at 24–25; *see* Tr. 63:7–9, 64:2–3.  But Paradyme's quote described its proposed technical approach to Call Order 0001 at length, including details about Paradyme's proposed TSCoE.  *See* AR 1279–90.  During oral argument, Ekagra argued "the Government should have considered whether or not [unbalanced pricing] created substantial risk in light of [Paradyme's] technical approach," Tr. 61:16–19, and that Paradyme "does not add any explanation for how [Call Order 0001] tasks will be performed" in its basis of estimate, Tr. 64:1–3.  But when Ekagra sought to "point [the Court] to some specific pages" in Paradyme's proposal, Ekagra referenced only a pricing spreadsheet.  *See* Tr. 63:7–20 (discussing AR 1358–59).  But the pricing spreadsheet, standing alone, cannot demonstrate Paradyme lacked an understanding of the RFQ's requirements.  In short, the TET and contracting officer had a sufficient basis in Paradyme's quote from which to distill and approve of its technical approach.[15]

Similarly, in claiming that Paradyme's Call Order 0001 price was so low that "it is clear that Paradyme did not understand this requirement," Pl. MJAR at 25, Ekagra ignores much of Paradyme's quote.  Paradyme explained its low price.  *See, e.g.,* AR 1279

---

[14] Ekagra agreed that the RFQ did not preclude *per se* the USCB's consideration of Paradyme's past work:

> THE COURT:  So you're saying [the RFQ] bars the use of any prior work?
>
> [EKAGRA COUNSEL]:  It makes it less relevant.
>
> . . . .
>
> THE COURT:  Well, if it doesn't bar it, then it's just up to the agency's discretion [and] whether or not it reasonably considered [Paradyme's] past work.
>
> [EKAGRA COUNSEL]:  Subject to reasonableness, you're right[.]

Tr. 37:2–13.

[15] *See, e.g.,* AR 2230–31 (Technical Re-Evaluation Consensus Report) ("Paradyme proposed to leverage experience, documentation, and success to quickly plan, draft, and finalize the TSCoE Vision Document and the TSCoE Enterprise Architecture."); AR 2264 (Contracting Officer Best Value Determination) ("Overall Paradyme's approach includes:  (1) leveraging existing artifacts for similar work they performed at USCB; (2) pricing Call Order 0001 based on each deliverable and by assuming these artifacts provide the basis for developing the deliverables in this Solicitation[;] and (3) their knowledge of USCB business.").

("Rather than starting from scratch, Paradyme can scale and enhance [its prior work product] through the finalization and codification of our processes[.]"); AR 1282–84 ("Paradyme has a collection of [standard operational procedures], best practices, and other documentation that it has used to provide TSCoE support that we can leverage to create [new TSCoE deliverables] . . . . Our team will review and streamline these documents into an easy to consume set of processes and best practices[.]").

The PET, in turn, found Paradyme "provided information above and beyond what was required in the [RFQ]." AR 2245 (Price Evaluation Team Report). From this information, the PET was "able to determine that Paradyme's overall [Call Order 0001] costs differ considerably from the IGCE because of the number of hours they assumed it would take." *Id.*; *see also* AR 2250 (Price Evaluation Team Report) ("The IGCE assumed that a vendor would complete the work with no prior experience at USCB. The estimate included time for discovery, development, and implementation. Paradyme's approach differed considerably from that used to develop the IGCE.").

Additionally, Paradyme assumed in its price quote that "the Basis of Estimate (BOE) for Call Order 0001 is based on 'actuals from the current tools program that Paradyme is the incumbent on.'" AR 2245 (quoting a Paradyme pricing spreadsheet). The contracting officer reasonably concluded that Paradyme — the company that had experience developing a standard-supporting Census TSCoE — could "minimize the research and development needed to create and implement a [TSCoE]" *and* "provide[] the best technical quote." AR 2264; AR 2289 (Award Memorandum) (same). The Court thus rejects Ekagra's effort to manufacture a shortcoming in Paradyme's proposal out of its lower price; Ekagra cannot so easily gloss over the substance of Paradyme's quote and how Paradyme proposed to leverage its prior Census experience.

### C. Census Reasonably Considered Unbalanced Pricing (Count Five)

The Court addresses Ekagra's unbalanced pricing argument by first making clear what the RFQ does — and does *not* — provide. The RFQ contains the following provision in Section M.3 (Factor 5 — Price Quotation) under the heading "Price Evaluation":

> A determination will be made regarding whether the price appears unbalanced either for the total price of the quote or separately priced line items. An analysis will be made by item, resource, quantity, and year to identify any irregular or unusual pricing patterns. An unbalanced quote is one that incorporates prices that are less than cost for some services and/or prices that are overstated for other services.

AR 1131. The RFQ says nothing more about unbalanced pricing.

Thus, the RFQ does *not* incorporate, either expressly or by reference, FAR 15.404-1(g) ("Unbalanced pricing"). And because this is a FAR part 8 procurement, AR 1015 (RFQ § B.2), FAR part 15 provisions do not automatically apply. *See* FAR 8.404(a). Accordingly, the RFQ does not specify any consequence for an unbalanced pricing finding.[16] Nevertheless, the Court assumes, without deciding, that a finding of unbalanced pricing requires the contracting officer to "[c]onsider the risks to the Government associated with the unbalanced pricing" and "whether award of the contract will result in paying unreasonably high prices for contract performance." FAR 15.404-1(g)(2)(i)-(ii). Even under FAR 15.404-1(g), however, there is no requirement for the contracting officer to exclude an offeror from an award due to unbalanced pricing. *See* FAR 15.404-1(g)(3) (providing only that "[a]n offer *may* be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government" (emphasis added)); FAR 2.101 ("*May* denotes the permissive.").

Here, there is no dispute that the PET found Paradyme's Call Order 0001 price unbalanced. AR 2246. The only question, therefore, is whether "[t]he contracting officer failed in his duty to analyze balance" — or, more precisely, to consider any associated risks or consequences of the PET's unbalanced price finding. Pl. MJAR at 31. According to Ekagra, the contracting officer failed to "address — implicitly or explicitly — the risks and concerns the PET raised" and "did not consider whether award of the contract would result in paying unreasonably high prices." *Id.* Ekagra does not suggest how Paradyme's low *fixed* price for Call Order 0001 might somehow result in the government's ultimately paying a higher price; thus, Ekagra simply asserts, in essence, that the contracting officer failed to consider the possibility of some unidentified, unarticulated risks. Contrary to Ekagra's assertions, however, the PET, the TET, and the contracting officer *all* considered Paradyme's Call Order 0001 pricing — in light of its technical approach — and did not assign any weaknesses or risks.

The PET specifically found Paradyme's offer, overall, reasonable and supported:

> **Paradyme Management, Inc.,** proposed rates and prices do not appear unbalanced for Master BPA labor rates and Call Order 0002. . . . Paradyme's cost for Call Order 0001 is significantly less than the other offerors. Therefore, through price analysis, the PET was able to determine that the offer from Paradyme is fair and reasonable. The fair and reasonable price was determined based on this procurement being competed via the General Services Administration

---

[16] The Court further notes that the RFQ's unbalanced pricing provision differs in material respects from FAR 15.404-1(g).

(GSA Schedule where the rates are pre-negotiated, as well as the prices already being determined fair and reasonable).

AR 2245.  Indeed, the PET found that Paradyme's "price quote for Call [O]rder 0001 provided information *above and beyond* what was required in the Solicitation" and "with further analysis . . . [the PET] determine[d] that Paradyme's overall costs differ considerably from the IGCE because of the number of hours they assumed it would take to complete all tasks associated with Call Order 0001."  AR 2245 (emphasis added) (crediting Paradyme's "assumption provided in their price quote" based on "actuals" from Paradyme's incumbent experience).  The PET specifically noted the TET's express determination "that Paradyme accounted for all deliverables and requirements in their basis of estimate" and that Paradyme's "overall total price to Government for Call Order 0001 . . . was clearly supported" in the price quotation worksheet.  AR 2248.

The PET expressly considered that the TET had identified three "deliverables" for which "Paradyme underestimated the level of effort to complete in the required timeframe."  AR 2248.[17]  But the PET clearly addressed those concerns, finding that: (1) "Paradyme's approach differed considerably from that used to develop the IGCE"; and (2) while "[t]he other Offerors['] estimates appear to have accounted for the need for discovery, development, and implementation," Paradyme, "[w]ith its prior experience, . . . was able to reduce the overall cost to accomplish the same work."  AR 2250; *see also* AR 2253 (discussing Paradyme's approach to Call Order 0001 and concluding that "all quoters['] proposed prices for Call Order 0001 are deemed fair and reasonable in comparison to the IGCE"); AR 2254 ("The [PET] determined that all quoters . . . provided acceptable price quotes[,] . . . . the price submission have been deemed fair and reasonable, and the technical factors must be considered to make a best value determination.").

Accordingly, neither the PET nor the TET failed to address risks associated with Paradyme's low price for Call Order 0001.  The PET and TET clearly were comfortable that a contract award to Paradyme would not result in poor performance or the government's paying an unreasonably high price.  Indeed, given the above-quoted excerpts from the procurement record, the Court is not sure what Ekagra is complaining about.  Although Ekagra argues otherwise, *see* Pl. Resp. at 11–12, the contracting officer adequately considered and addressed the TET's and PET's respective consensus reports in determining that Paradyme's offer did not present any risks.  *See* AR 2258 ("I have

---

[17] In addition to identifying [ * * * ] deliverables for which Paradyme underestimated the required hours, the PET also identified [ * * * ] other deliverables for which it found Paradyme overestimated the hours required by a total of [ * * * ] hours.  AR 2245.  As discussed *infra*, Census considered all of these facts in determining that Paradyme's quote was technically superior, without performance risks, and would not result in the government's paying a higher price.

reviewed the TET's findings and ranking[] [and] the PET report, and agree with the contents therein.").[18]

For example, the contracting officer concluded that "Paradyme was the only Offeror that addressed and met every requirement identified in the solicitation, thus demonstrating a full understanding of the requirements in their technical quote *and had no weaknesses or risks identified*."  AR 2258 (emphasis added).  The contracting officer specifically found that "the PET provided [the] TET with the [BOE] submitted with the Paradyme price quote and . . . [the] TET determined that Paradyme accounted for all deliverables and requirements in their BOE."  AR 2264.  Indeed, the contracting officer concluded that Paradyme's unique approach to Call Order 0001 "led to Paradyme's significantly reduced cost compared to the Offerors and the IGCE."  AR 2264.  According to the contracting officer, Paradyme's "combination of strategies meets the Government's requirements, while providing a significant cost savings for Call Order 0001."  AR 2264.  The contracting officer further concurred with the PET that Paradyme's price for Call Order 0001 was "fair and reasonable" and "deemed beneficial to the Government, as the proposed technical solution offered by Paradyme accounted for all deliverables and requirements."  AR 2265.[19]  In sum, unlike the decision in *CW Government Travel, Inc. v. United States*, 154 Fed. Cl. 721 (2021), upon which Ekagra relies, this simply is not a case in which the administrative record "is bereft of any apparent evidence" demonstrating that the government considered the impact of unbalanced pricing, Pl. MJAR at 32 (quoting *CW Gov't Travel, Inc.*, 154 Fed. Cl. at 746).

Finally, the Court agrees with Judge Meyers in *IAP World Services, Inc. v. United States*, 152 Fed. Cl. 384, 409 (2021), that an offeror may demonstrate prejudice simply "from [an agency's] failure to perform an unbalanced pricing analysis."  Unless the risks

---

[18] During oral argument, Ekagra asserted for the first time that the contracting officer's adoption of the TET's and PET's findings was improper because they contain "factually incorrect statements."  Tr. 35:23–24; *see also* Tr. 36:1–2 (arguing that TET and PET mistakenly found that Paradyme will be "leveraging existing artifacts for similar work they've performed at USCB").  Ekagra conceded, however, that it did not make this argument in its briefs (at least not with respect to unbalanced pricing).  Tr. 36:11–12.  The Court accordingly concluded the argument is waived.  Tr. 36:13; *see also, e.g.*, *Takeda Pharms. U.S.A., Inc. v. Mylan Pharms. Inc.*, 967 F.3d 1339, 1348 n.5 (Fed. Cir. 2020) (new argument presented for the first time at oral argument is waived); *Sistek v. Dep't of Veterans Affs.*, 955 F.3d 948, 957 (Fed. Cir. 2020) (concluding that legal theory presented for the first time during oral argument and not "in [an] opening brief" is waived); *Office Depot, Inc. v. United States*, 95 Fed. Cl. 517, 530–31 (2010) ("Because plaintiff's argument was not presented to the court until oral argument, the court considers this argument waived."); *Insight Pub. Sector, Inc. v. United States*, 157 Fed. Cl. 416, 427 n.8 (2021) (same).

[19] Although during oral argument Ekagra clarified that its argument is that Census failed to consider the risk that Paradyme "didn't propose sufficient labor to perform the work," Tr. 25:21–22, the contracting officer clearly considered that precise issue.

from unbalanced pricing appear obvious from the record, however, a plaintiff bears some minimal burden of explaining what risks the government ignored such that, had they been properly considered, the contracting officer's best value determination may have been altered. *Sys. Stud. & Simulation, Inc.*, 22 F.4th at 998 (holding that "there is no starting point of presumed prejudice," but acknowledging that "[t]he Supreme Court has noted that, at least in some contexts, prejudice will be easily shown because the circumstances will make prejudice readily apparent" (citing *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009))).[20]

In this case, Ekagra made no effort to explain what risks Census ignored in its analysis the Court summarized above.   Assuming FAR 15.404-1(g) applies to this procurement, that provision explains:

> The greatest risks associated with unbalanced pricing occur when — (i) Startup work, mobilization, first articles, or first article testing are separate line items; (ii) Base quantities and option quantities are separate line items; or (iii) The evaluated price is the aggregate of estimated quantities to be ordered under separate line items of an indefinite-delivery contract.

FAR 15.404-1(g)(1).  Ekagra does not address why any of those risks exist here, nor does Ekagra even suggest any other, presumably more minor risks Census should have considered.  Indeed, the Court cannot even guess what risks Ekagra has in mind, given that Call Order 0001 is a firm fixed price contract.  AR 1121 (RFQ § L.7.1.2).

In general, "to prevail on an allegation of unbalanced pricing, a protester must first show that one or more line item prices are significantly overstated since the risk in a line item price being overstated is that the Government will not receive the benefit of its bargain because other line items (for example, option quantities) will not be purchased." *AECOM Mgmt. Servs., Inc.*, B-417506.12, 2019 CPD ¶ 342, 2019 WL 5207000, at *19 (Comp. Gen. Sept. 18, 2019) (concluding that "the protester has not explained — and it is not

---

[20] *Cf. IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 318 (2022) ("[T]he [agency's] failure here to perform the correct analysis or to reach a reasonable conclusion — at least given the administrative record as it currently stands — constitutes prejudicial error."); *IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57, 87–88 (2022) (discussing "APA prejudice rules," and explaining that "[i]n *Mid Continent Nail Corp. v. United States*, [846 F.3d 1364, 1384–85 (Fed. Cir. 2017),] the Federal Circuit held that an agency's 'failure to comply with the APA was not a mere technical defect,' reasoning that although '[t]here [wa]s considerable uncertainty as to the effect of this failure,' the mere fact that it '*could well have* affected the result' of the agency's challenged determination was sufficient to constitute prejudice" (alterations in original)).  In this case, as explained below, Ekagra has not persuaded the Court that, even if this Court were to instruct Census to conduct a new unbalanced pricing analysis, the result of the procurement has any likelihood of changing.

apparent to us — how it may have been prejudiced by the agency's alleged failure to perform an unbalanced pricing analysis as between the fixed-price elements and cost-reimbursable elements"). Put differently, "the principal risk associated with accepting an unbalanced price proposal is that the government will not obtain the benefit of its bargain because it will purchase some line items but not others." *Id.*; *see also The Green Tech. Grp., LLC*, B-417368, 2019 CPD ¶ 219, 2019 WL 2635435, at *4 (Comp. Gen. June 14, 2019) (denying protest where "the protester has not challenged the accuracy of the solicitation's quantity or hour estimates, or asserted that the contract price would have to be adjusted for some other reason" and, thus, "on these facts, we see no reason to conclude that [the awardee's] CLIN pricing will result in [the government's] facing payment of a contract price above and beyond the fixed price quoted"). Moreover, "[w]hile both understated and overstated prices are relevant to the question of whether unbalanced pricing exists, the primary risk to be assessed in an unbalanced pricing context is the risk posed by overstated prices." *AECOM Mgmt. Servs., Inc.*, 2019 WL 5207000, at *19.

The Court further agrees — in line with other decisions of this Court and the GAO — that there is little risk from unbalanced pricing in firm fixed price contracts. *See Munilla Constr. Mgmt., LLC v. United States*, 130 Fed. Cl. 635, 652 (2017) ("[I]n the context of a firm fixed-price contract, the risk to the government of unbalanced prices does not hinge upon whether specific line items are overpriced or underpriced within a single performance period. Instead, the risk depends upon whether there is 'front loading': unbalanced pricing between the initial years and subsequent option years." (footnote omitted)). That is because, "[w]ith a firm fixed-price contract like the present one, the price 'is not subject to any adjustment on the basis of the contractor's cost experience,' so that the contractor bears 'maximum risk and full responsibility for all costs and resulting profit or loss.'" *Id.* at 652 n.11 (quoting FAR 16.202-1).[21]

Here, the Census evaluation teams did not register any concern regarding "front loading" in Call Order 0001. Moreover, Census concluded that Paradyme's quote did not pose any pricing or technical performance risks. AR 2264–65 (Contracting Officer Best Value Determination) ("Paradyme provided an adequate solution that . . . had a few strengths, with no weaknesses or risks overall compared to the other three vendors . . . . [B]ased on the evaluation of the quotes submitted . . . Paradyme would provide the highest likelihood of success[.]"); *see CrowderGulf, LLC, et al.*, B-418693, 2022 CPD ¶ 90,

---

[21] *See also First Enter. v. United States*, 61 Fed. Cl. 109, 125 (2004) ("Because this protest involves a fixed-price contract — not, for example, a cost reimbursement or indefinite delivery/indefinite quantity contract — [the contractor] would be unable to alter the contract price after award and, therefore, unable to recoup losses from the government." (footnote omitted)); *CrowderGulf, LLC, et al.*, B-418693, 2022 CPD ¶ 90, 2022 WL 1135061, at *9 (Comp. Gen. Mar. 25, 2022) ("[L]ow prices (even below-cost prices) are not improper and do not themselves establish (or create the risk inherent in) unbalanced pricing.").

2022 WL 1135061, at *12 (Comp. Gen. Mar. 25, 2022) ("[W]e see no basis to conclude that the agency should have evaluated understated line-item prices for performance risk and deny this ground of protest.").

In addition, while Census expressly recognized that Paradyme's Call Order 0002 price was higher than Ekagra's quote for Call Order 0002, the contracting officer rationally concluded that Paradyme's quote represented the best value because "Ekagra's technical quote has significant weaknesses and high risks" and "was technically unacceptable." AR 2265. In contrast, "Paradyme's technical quote had no weaknesses or risks and would meet the Government's requirements, thus justifying the increase in cost" of approximately $1.267 million for Call Order 0002. AR 2265. Accordingly, the contracting officer fully appreciated Paradyme's higher cost for Call Order 0002 but nevertheless preferred Paradyme. Relatedly, the contracting officer was not misled by Paradyme's much lower (fixed) price for Call Order 0001; even within Call Order 0001, the contracting officer reasonably concluded that Paradyme adequately explained its technical approach to achieve its lower price. AR 2264 (summarizing Paradyme's approach and finding that "[t]his approach led to Paradyme's significantly reduced cost . . . . [and] meets the Government's requirements, while providing a significant cost savings for Call Order 0001.").

In sum, Ekagra's unbalanced pricing argument fails even if FAR 15.404-1(g) applies because Census considered and addressed Paradyme's pricing and neither Ekagra nor the administrative record itself[22] suggests any risks that the contracting officer failed to consider and that might have impacted the contract award decision.

### D. Ekagra Fails to Demonstrate Prejudice on the Merits for Count One and Count Two, Even Assuming Ekagra Had Standing to Pursue those Counts

Even if Ekagra had alleged sufficient facts in its complaint to establish standing for Counts One and Two — and even assuming Ekagra could prove the government erred as generally alleged in those counts — they nevertheless flounder on the rocky shoals of prejudice. Indeed, Ekagra does not prove that USCB's putative errors prejudiced Ekagra.

Take Count One. Ekagra argues in its MJAR that, had Census correctly evaluated past performance, Ekagra would have received an additional strength. Pl. MJAR at 20.

---

[22] Judge Meyers' decision regarding unbalanced pricing in *IAP World Services* is distinguishable because, there, "the Government's argument ignore[d] that the [agency] itself understood" that at least part of the contract did "*not* operate as a firm fixed-price contract" and "[t]hus, within each period of performance, there could certainly be a risk associated with unbalanced pricing — *i.e.*, some tasks being overpriced while others are underpriced." 152 Fed. Cl. at 407 (emphasis added). In this case, no such risks are apparent from the record before the Court involving the firm fixed price call order at issue.

Ekagra makes literally zero effort to show how the additional strength might translate to a different best value decision.  Count Two — challenging a single weakness assigned to Ekagra's technical proposal — is similarly defective.  *See* Pl. MJAR at 20–21.  Even if the Court assumes Census erred in assigning Ekagra a weakness for its personnel retention strategy, Ekagra does not demonstrate why receiving "one less weakness," *id.*, would at all undermine the validity of the best value decision Ekagra challenges.

There is no evidence that additional strengths or the removal of a weakness could somehow counterbalance the finding that Ekagra's quote was technically unacceptable and, indeed, Ekagra makes no effort to argue otherwise.  Although the Court need not say more to dispose of Counts One and Count Two, the Court nevertheless notes that the administrative record conclusively shows that even a slew of strengths cannot overcome significant weaknesses.  In that regard, Census rejected [ * * * ]'s and [ * * * ]'s respective quotes — both of which had more strengths than either Paradyme or Ekagra — as technically unacceptable.  AR 2231–39.  Thus, total strength count was not dispositive of whether Census found an offer technically acceptable.  Ekagra's technical unacceptability resulted from its significant weaknesses rather than a dearth of strengths.[23]

* * * *

In sum, the pathway to victory for Ekagra here was limited.  Ekagra had to demonstrate either (1) that Census erred in finding Ekagra's quote technically unacceptable; or (2) that Paradyme's quote should have been disqualified.  Having done neither, Ekagra's challenge to this procurement fails.

## V.    CONCLUSION

For the above reasons, the Court **DENIES** Plaintiff's motion for judgment on the administrative record and **GRANTS** Defendant's and Defendant-Intervenor's respective motions for judgment on the administrative record.  Accordingly, the Clerk of the Court is directed to enter **JUDGMENT** for Defendant and Defendant-Intervenor, terminating this case.

**IT IS SO ORDERED**.

s/ Matthew H. Solomson
Matthew H. Solomson
Judge

---

[23] *See* Def.-Int. Rep. at 12 ("The [USCB's] determination that Ekagra was technically unacceptable was premised entirely on the three Significant Weaknesses in its technical proposal.  Ekagra has not even challenged one of its three Significant Weaknesses[.]" (administrative record citations omitted)); Tr. 9:3–4 (Ekagra conceding that it "was technically unacceptable because of the weaknesses").